SEALED

AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Indiana

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| | ) | |
| | ) | 2:21-mj-0048-CMM |
| Melissa Miller - 01 | ) | |
| Christopher Dixon - 02 | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  5/10/21, 6/21/21, and 6/30/21  in the county of  Vigo  in the

  Southern  District of  Indiana , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Count 1: 21 U.S.C. § 841(a)(1), (b)(1)(B) | Distribution of 50 Grams or More of a Mixture or Substance Containing a Detectable Amount of Methamphetamine (Miller-01) |
| Count 2: 21 U.S.C. § 841(a)(1), (b)(1)(A) | Possession with Intent to Distribute 50 Grams or More of a Mixture or Substance Containing a Detectable Amount of Methamphetamine (Dixon-02) |
| Count 3: 21 U.S.C. § 841(a)(1), (b)(1)(A) & 18 U.S.C. §2 | Possession with Intent to Distribute 500 Grams or More of a Mixture or Substance Containing a Detectable Amount of Methamphetamine (Miller-01, Dixon-02) |

This criminal complaint is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

/s/ Brian Bourbeau
*Complainant's signature*

Brian Bourbeau, Task Force Officer, DEA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by
  Telephone  *(reliable electronic means)*

Date:   November 5, 2021

City and state:    Indianapolis, Indiana

Doris L. Pryor
United States Magistrate Judge
Southern District of Indiana

## AFFIDAVIT IN SUPPORT OF
## APPLICATION FOR CRIMINAL COMPLAINT

I, Brian Bourbeau, a Task Force Officer with the Drug Enforcement Administration (DEA), Terre Haute Post of Duty (THPOD), Terre Haute, Indiana, being duly sworn, state as follows:

### INTRODUCTION

1.      I am a Task Force Officer with the Drug Enforcement Administration (DEA) and have been assigned to the Evansville, Indiana Resident Office since December, 2018.  Prior to being assigned to the DEA as Task Force Officer, I have been employed as a Police Officer with the Terre Haute Police Department (hereinafter THPD) since January 2010.  During my tenure with THPD, I was assigned to Uniform Patrol until April 2014 at which time I was assigned to the Vigo County Drug Task Force (hereinafter VCDTF).

2.      During such time as a detective, and in my official capacity as a Task Force Officer, I have conducted criminal investigations and have participated in investigations regarding violations of various Federal laws, including the manufacture and distribution of controlled substances, in violation of Title 21, United States Code (USC), Sections 841, 843, 846, 848 and conspiring to commit each of these crimes.  In addition, I have received specialized training concerning organized crime, drug investigations, operation of informants, and techniques used in laundering drug proceeds.  I have executed numerous search warrants, made numerous arrests, and have supervised activities of informants who have provided information and assisted in such criminal matters.

3.      I have received training in investigations involving electronic surveillance, the interception of both wire communications and the electronic communications.  I am familiar with the ways in which drug traffickers conduct their business, including, but not limited to, their

1

methods of importing and distributing controlled substances, their use of telephones and their use of numerical codes and code words to conduct their transactions.

4.      I am familiar with and have participated in all of the normal methods of investigation, including, but not limited to, visual surveillance, the general questioning of witnesses, the use of informants, the use of pen registers and undercover operations.

5.      The information contained in this affidavit is based on my personal participation in an ongoing DEA investigation and knowledge obtained from other DEA members, cooperating individuals, investigative reports, conversations with, and a review of reports generated by, local, county, and state law enforcement officials.  Since this affidavit is being submitted for the limited purpose of securing an arrest warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause necessary for obtaining the arrest warrant.

6.      I make this affidavit in support of an Application for a Criminal Complaint against Melissa MILLER (DOB XX/XX/1976) for distribution of fifty (50) grams or more of a mixture or substance containing a detectable amount of methamphetamine and possession with intent to distribute five hundred (500) grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.  and Christopher DIXON (DOB XX/XX/1990) for possession with intent to distribute fifty (50) grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of Title 21, United States Code, Section 841(a)(1) and possession with intent to distribute five hundred (500) grams or more of a mixture or substance containing a detectable amount of methamphetamine, in

2

violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

## PROBABLE CAUSE

1. Beginning in April 2021, investigators with the Vigo County Drug Task Force (VCDTF) and DEA, Terre Haute Post of Duty (THPOD) began an investigation into the Christopher DIXON (hereinafter DIXON) drug trafficking organization. As part of the investigation, VCDTF utilized a confidential informant (hereinafter "CI #1").[1]

2. On April 2, 2021, Detective Daniel LaFave and Detective Lance Sanders met with CI #1. CI #1 stated that CI #1 had engaged telephone number (217) 213-9567 ("Phone I") in a text message conversation outside the presence of law enforcement. CI #1 reported that the text message conversation was utilized to order methamphetamine and to discuss a pre-existing drug debt that CI #1 owed the person CI #1 knew as Chris DIXON. CI #1 showed Detective LaFave the text message conversation, which was photographed by Detective Lafave.

3. Detective LaFave observed that the contact listed as "Boss" in CI #1's telephone, was assigned telephone number (217) 213-9567 (Phone I)[2]. The text message conversation contained numerous messages between CI #1 and Phone I. Your Affiant later examined the messages and observed that the messages were utilized to arrange the purchase of methamphetamine. The entirety of the text message conversation is not detailed below, only the messages observed by your Affiant that arranged the purchase of methamphetamine.

---

[1] CI #1 was cooperating in hopes of gaining consideration on a pending charges involving methamphetamine dealing. CI #1 has felony convictions for robbery in 1986, 2014 possession of narcotic drug, 1988 aggravated battery, 1997 robbery, 2001 aggravated DUI, 2002 aggravated battery, and 2013 sexual battery. CI #1' information has been corroborated by the investigation.

[2] Phone I is registered to Jazarae Rodgers, who the investigation has identified as Dixon's wife.

4.      Beginning on or about March 28, 2021, Phone I sent a message to CI #1 stating, "Man Look u owe me like 8 I'm not bout to keep taking losses." CI #1 later responded, after additional text messages, "Thank you brother unfortunately we've been here before but got damn it I can't lose forever brother hope the money upfront helps I'll come up with that much can I get a whole one." CI #1 later sent an additional message stating, "Hey man i can have cash together tomorrow Boss hold it back for me please 5500." Phone I responded with a text message stating, "U come to me I can get it for 8."  Based on your Affiant's training, experience, and this investigation, your Affiant believes this conversation involves DIXON telling CI #1 that CI #1 owes DIXON $8,000 (Man Look u owe me like 8"). CI #1 responds that CI #1 will come up with the money and wants a pound of methamphetamine ("I'll come up with that much can I get a whole one").  CI #1 later tells DIXON that CI #1 will have the cash together and wants the pound held back ("Hey man i can have cash together tomorrow Boss hold it back for me please").  DIXON responds by saying if CI #1 comes to him, DIXON can get the pound of methamphetamine for $8,000 ("U come to me I can get it for 8").

5.      On April 15, 2021, your Affiant was informed by CI #1 who stated that DIXON was utilizing a new phone number. CI #1 provided your Affiant with DIXON's new phone number as (217) 504-4448 (hereinafter Phone II).

6.      On April 16, 2021, your Affiant, along with Detectives Daniel LaFave and Matt Murray were conducting what investigators originally believed to be an unrelated methamphetamine investigation in Terre Haute, Indiana. During the course of that investigation, detectives developed an individual who agreed to cooperate with law enforcement. The individual (hereinafter CI #2)[3] stated that he/she had been purchasing multiple ounce size quantities of

---

[3] CI # 2 in cooperating with law enforcement in lieu of criminal charges.  CI #2 has no felony convictions.  CI #2's information has been corroborated by the investigation.

4

methamphetamine from Misty MILLER (hereinafter MILLER). CI #2 stated that CI #2 purchased methamphetamine from MILLER multiple times per week. CI #2 stated that MILLER purchased pound or larger quantities of methamphetamine from a black male, further stating that the black male either transported the methamphetamine to MILLER or had it shipped to her residence from out of state. CI #2 provided investigators with MILLER's cellular phone number, (812) 229-0315.

7.    Your Affiant reviewed call detail records for Phone I and Phone II.[4] Your Affiant observed that DIXON, utilizing Phone I had eighty-five (85) communications with MILLER, utilizing phone number (812) 229-0315. These contacts were observed to have been made between February 1, 2021 and April 2, 2021. Your Affiant observed that DIXON, utilizing Phone II, had five (5) communications with MILLER, utilizing phone number (812) 229-0315. These contacts were observed to have been made between April 9, 2021 and April 12, 2021.

8.    On April 20, 2021, your Affiant met with CI #1. CI #1 showed your Affiant a text message conversation that CI #1 had previously completed (outside the presence of law enforcement) with DIXON, utilizing Phone II. Your Affiant reviewed the text messages and located a message sent to Phone II. A portion of the message stated, "i still need to make some money and im clearly stuck in this one-horse town." DIXON, utilizing Phone II replied with two text messages which stated, "Naw I'm not moving," and "I'm still gone be there."  Based upon training, experience, and this investigation, your Affiant believes the conversation involved CI #1 informing DIXON that CI #1 was still needing to purchase methamphetamine from DIXON (""i still need to make some money and im clearly stuck in this one horse town"). DIXON replied to CI #1 informing the CI that DIXON would still be available and in the Terre Haute, Indiana area ("Naw I'm not moving" and "I'm still gone be there").

---

[4] Subscriber information from Phone II revealed that Phone II was subscribed to by Chris Dixon, 211 Cronkhite Avenue, Danville, Illinois.

9.      On May 10, 2021, at approximately 1:50 PM, Detectives Daniel LaFave and Jim Palmer met with CI #2 at a pre-determined staging area. Detective Palmer conducted a search of CI#2's vehicle, and Detectives LaFave and Palmer both conducted a search of CI #2's person. Detectives did not locate any money, drugs, or contraband.

10.     Detectives supplied CI #2 with six hundred dollars ($600.00) of photographed VCDTF official advanced funds (OAF) to be used in the controlled buy targeting MILLER. Detectives equipped CI #2 with audio/video recording devices so the impending drug transaction could be monitored and recorded.

11.     At approximately 1:56 PM, Detective LaFave activated the audio/video recording devices, and CI #2, along with Detectives, departed the staging area.

12.     At approximately 2:02 PM, CI#2 arrived at 3959 East Broadlands Avenue. Shortly after arriving, CI #2 was observed entering the residence.  Detectives Larry Hopper, Matt Murray, and Lance Sanders maintained visual surveillance of CI #2 as CI #2 entered 3959 Broadlands Avenue. Detectives observed that CI #2 had no physical contact with anyone, and CI #2 made no unnecessary stops or detours prior to arriving at the target location.

13.     At approximately 2:15 PM, CI #2 was seen leaving 3959 Broadlands Avenue and departing the area. Detectives Hopper, Sanders, and Murray assisted in visual surveillance of CI#2 as they departed the target location.

14.     CI #2 then returned to a pre-determined staging area. Detectives observed CI #2 during this time and observed that CI #2 had no physical contact with anyone, and CI #2 made no unnecessary stops or detours prior to arriving back at the staging location.

15.     At approximately 2:21 PM, CI #2, along with Detectives, arrived at the staging location. Once at the staging location, Detectives recovered two bags from CI #2. One bag was a

white paper bag containing a crystal-like substance, and the other was a clear plastic bag containing a crystal-like substance. Detectives recovered the audio-video recording devices, and Detectives Murray and Sanders conducted a search of the CI #2's vehicle, while Detectives Palmer and LaFave conducted a search of CI #2's person. No money, drugs, or contraband was found.

16.    Detective LaFave secured the suspected methamphetamine and debriefed CI #2 regarding the controlled buy. CI #2 stated that he/she arrived, and MILLER was out front speaking to a male who cuts her grass along with an unknown female friend. Following a brief conversation, CI #2 entered the residence along with MILLER. No other subjects were observed in the residence by CI #2. CI #2 stated that MILLER told CI #2 to retrieve a paper bag containing a crystal-like substance that was left on the couch. CI #2 stated that MILLER then retrieved an additional amount of methamphetamine from another room and brought it to CI #2. CI #2 stated he/she provided MILLER with VCDTF six hundred (600) dollars of OAF. CI #2 stated that he/she provided ($600.00) dollars for one (1) ounce of methamphetamine and was given one (1) additional ounce of methamphetamine with the understanding that CI #2 would pay MILLER an additional $600.00 dollars at a later time.

17.    After the debriefing was concluded, CI#2 was released.

18.    Detectives later returned to the VCDTF office. The clear plastic bag was found to have a preliminary gross weight of 29.2 grams, and the crystal-like substance field-tested presumptively positive for methamphetamine. The white paper bag was found to have a preliminary gross weight of 33.5 grams, and the crystal-like substance field-tested presumptively positive for methamphetamine.

7

19.    The bags containing the crystal-like substances were sealed into evidence and secured into Terre Haute Police Department temporary storage per policies and procedures.

20.    Detective LaFave downloaded the audio/video recordings from the controlled drug transaction with MILLER. During the recordings, Detective LaFave verified CI #2's account of what had occurred. During the video, MILLER's face was visible multiple times. Detective LaFave secured the audio/video recordings into VCDTF temporary storage per policies and procedures.

21.    Detective LaFave located Melissa MILLER in a police reporting system. Detective LaFave found a photograph of MILLER and showed it to CI #2, who confirmed it was the subject the CI knew to be "Misty." Melissa A MILLER, DOB XX/XX/1986, had listed (812) 229-0315 as her phone number during a 2016 Incident Report and again during a 2018 Incident Report.

22.    On June 2, 2021, Detective Lance Sanders was granted a state search warrant by Judge Michael Lewis of the Vigo County Court, Division 6, cause #84D06-2106-MC-1819, authorizing the interception of cell site location information for the cell phone, (217) 504-4448, of DIXON.

23.    On June 21, 2021, CI #1 contacted Detective Sanders. CI #1 stated that CI #1 had contacted DIXON to arrange the purchase of one (1) or two (2) pounds of methamphetamine for the price of seven thousand dollars ($7000) to be delivered to Vigo County. DIXON advised CI #1 that the drug transaction would be completed at TGI Fridays, 3401 S. US HWY 41, Terre Haute, IN.

24.    On that same date, utilizing cell site location from the above stated warrant, Detectives from the Vigo County Drug Task Force, along with members of the Terre Haute Police Department Patrol Division, began to monitor Christopher DIXON's location as he

8

traveled from Chicago, IL to Danville, IL. DIXON's then began to travel from the Danville, IL area to State Road 63 southbound towards Terre Haute, IN.

25.    On June 21, 2021, CI #1 contacted Detective Sanders. CI #1 stated that CI #1 had contacted DIXON to arrange the purchase of one (1) or two (2) pounds of methamphetamine for the price of seven thousand dollars ($7000), to be delivered to Vigo County. DIXON advised CI #1 that the drug transaction would be completed at TGI Fridays, 3401 S. US HWY 41, Terre Haute, IN.

26.    On that same date, utilizing cell site location from the above stated search warrant, VCDTF detectives, along with members of the Terre Haute Police Department Patrol Division, began to monitor DIXON's location as he traveled from Chicago, Illinois to Danville, Illinois. DIXON's phone then began to travel from the Danville, Illinois area to State Road 63 southbound towards Terre Haute, Indiana.

27.    Sergeant Charles Burress located a silver Nissan Rogue (OHIO Plate # HVS5866) traveling south on State Road 63. Sergeant Burress observed the Nissan Rogue exceeding the posted speed limit on US 63. This infraction was observed by Sergeant Burress "pacing" the Nissan. Sergeant Burress then observed the Nissan abruptly stop in the middle of the intersection at 1st Street and Maple St.

28.    Sgt. Justin Sears conducted a traffic stop on the silver Nissan Rogue for the speeding infractions witnessed by Sgt Burress.

29.    Sergeant Sears approached the passenger side of the vehicle and spoke with the occupants, DIXON (driver) and Jazarae Rodgers (front passenger). Sergeant Sears requested both identification and registration from the driver, DIXON provided a driver's license from Georgia and Rodgers retrieved a rental agreement from her phone. DIXON and Rodgers advised that they

9

were traveling from Chicago to Terre Haute to eat at TGI Friday's. Detective Sanders, who was on scene, began conducting license and registration inquiries while Sergeant Sears had the occupants exit the vehicle to conduct a free air sniff with his K9 Partner Ossy. Ossy had a distinct change of behavior near the center of the rear hatch and gave a positive alert for the odor of illegal narcotics.

30.    K9 Ossy is assigned to Sergeant Sears of the Terre Haute Police Department, who is also a certified Vohn Liche Kennel Instructor. K9 Ossy is a Dual Purpose K9 trained in Patrol Apprehension and Narcotic Detection. Master K9 Trainers employed by Vohn Liche Kennels imprinted K9 Ossy with Narcotic Detection. K9 Ossy is certified to detect marijuana, heroin, cocaine, and methamphetamine. K9 Ossy has completed 240hrs of training at Vohn Liche while attending the K9 Basic Course. K9 Ossy attends and completes monthly in-service K9 Training with certified Vohn Liche Kennel Instructors. The monthly training is separated into two days per month and consists of training in both Patrol Apprehension and Narcotic Detection. K9 Ossy completes yearly certifications in both Patrol Apprehension and Narcotic Detection by both American Working Dog and Vohn Liche Kennels.

31.    Sergeant Sears then opened the rear hatch and observed a suitcase. The suitcase contained numerous wigs, female clothing (mostly with tags) along with female hygiene/ makeup items. Sergeant Sears pressed on the side of the suitcase and could feel a large bulge which felt like a crystal substance as he squeezed it. The item was hidden in the liner of the suitcase. Sergeant Sears made a cut into the liner and located a large black plastic bag containing a crystal like substance.

32.    DIXON and Rodgers were detained by Sgt. Burress and Detective Sanders. Detective Sanders then read DIXON and Rodgers their Miranda Rights. Both DIXON and

10

Rodgers stated they understood their rights. DIXON stated that everything in the car was his. Detective Sanders asked DIXON about the large oblong package wrapped in black plastic that was located in the suitcase and DIXON stated that everything in the suitcase was his.

33.     Detective Sanders later unraveled the plastic bag and discovered vacuumed sealed bulk packaging containing a crystal-like substance. The crystal-like substance was consistent with crystal methamphetamine in texture and appearance. Detective Sanders completed a field test kit on the crystal substance which yielded a presumptive positive result for the presence of methamphetamine. Detective Sanders later transported the bag of crystal-like substance to the Terre Haute Police Department where it was found to have a preliminary gross weight of four hundred and eighty-three (483) grams.

34.     The initial statement given by DIXON to Sgt. Sears was that they, DIXON and Rodgers, had left Chicago earlier and were going to T.G.I Friday's to eat, further stating that they lived in Danville, Illinois. This travel pattern is much more consistent with the trafficking of illegal narcotics than traveling approximately 183 miles for a Friday's restaurant. Both DIXON and Rodgers were arrested for Dealing Methamphetamine (Level 2 Felony) and Possession of Methamphetamine (Level 3 Felony). Officer Thomas Welch transported Rodgers and Officer Kevin Love transported DIXON to the Vigo County Jail.

35.     Other items collected during the traffic stop included $1324 in U.S. currency, a cellphone belonging to DIXON and a cellphone belonging to Rodgers. All items collected were sealed into evidence at the THPD per THPD policies and procedures. The US Currency was secured into the THPD drop safe.

36.     On June 22, 2021, your Affiant and Detective Sanders in the presence of Officer Clements conducted an audio and video recorded interview at the Vigo County Jail with DIXON.

DIXON was again read his Miranda Rights and he signed a copy of these rights stating he understood his rights and agreed to speak with Detectives. While speaking with DIXON, Detectives made aware that he was at the center of a Vigo County Drug Task Force Investigation for several months. DIXON stated he was willing to cooperate with Detectives admitting that he had driven to Terre Haute to deliver one (1) pound of methamphetamine.

37.    After the interview was completed DIXON was left in the custody of the Vigo County Jail. On June 23, 2021 DIXON and Rodgers posted fifty thousand (50,000) cash bond and were released from the Vigo County Jail.

38.    On June 23, 2021, Detective Lance Sanders applied for and was granted a search warrant for DIXON's cellular phone. The search warrant, state cause number 84D06-2106-MC-2065, was granted by the honorable Judge Michael Lewis, Vigo County Court Division 6.

39.    Pursuant to the search warrant, DIXON's cellular phone was downloaded, extracting all available data from the device.

40.    On June 30, 2021, Detectives Daniel LaFave and Lance Sanders applied for and were granted a search warrant for 3959 Broadlands Avenue, Terre Haute, Indiana. The search warrant, cause #84D06-2106-MC-002168, was granted by the honorable Judge Michael Lewis, Vigo County Court Division 6.

41.    On that same date, at approximately 2:06 PM, VCDTF Detectives LaFave, Sanders, Matt Murray, Jim Palmer, Marty Dooley, DEA THPOD Task Force Officer Jason Kempf, and your Affiant executed the search warrant at 3959 E Broadlands Avenue. While approaching the residence, investigators observed Melissa MILLER on a motorcycle in the driveway, as if preparing to leave. Investigators entered the driveway and Detective LaFave spoke to MILLER, who got off of the motorcycle to speak with Detective LaFave.

42.    Detective LaFave observed MILLER to be visibly shaking and nervous. Detective LaFave explained to MILLER that he was a Detective with the VCDTF and that Investigators were there to execute a search warrant. MILLER stated that illegal items would be located in the residence, additionally stating that the backpack she possessed also contained illegal items. MILLER advised no one else was inside of the residence and Investigators completed an initial sweep of the residence to confirm MILLERS statement. No additional subjects were located inside of 3959 Broadlands Avenue.

43.    In the presence of Detective Sanders, Detective LaFave read MILLER an Advice of Rights form. MILLER stated she understood and signed the Waiver of Rights. MILLER was then read a Consent to Search form. MILLER stated she understood and signed the form consenting to a search of 3959 E Broadlands Avenue.

44.    MILLER explained to Detective LaFave that there was likely more than five (5) pounds of methamphetamine in the residence. MILLER stated she believed there were 2-3 guns in the residence along with an unknown amount of US Currency. MILLER additionally stated that she possessed an amount of methamphetamine contained inside of her backpack.

45.    A search was completed of the backpack being worn by MILLER. Within the backpack, investigators located seven hundred and twenty-nine (729) dollars in US Currency along with five (5) plastic bags, each containing crystal like substances. The plastic bags containing the crystal like substances were later found to have a combined preliminary gross weight of approximately 90.6 grams. Field tests on representative samples of the crystal-like substances yielded presumptive positive results for the presence of methamphetamine.

46.    A search of the residence was completed. MILLER's bedroom was on the far east side of the residence. Within this bedroom, detectives located five (5) large plastic bags, each of

13

which contained a significant amount of crystal-like substance. The plastic bags containing the crystal-like substances were later found to have a preliminary gross weight of approximately 2,275 grams. Under the bed, detectives located two plastic Tupperware-like containers, each containing crystal-like substances. The Tupperware containers were later emptied into THPD Evidence envelopes and were found to have preliminary gross weights of approximately 232.6 and 192.2 grams. Also, in the bedroom, detectives located twelve (12) plastic bags each containing crystal-like substances. The 12 plastic bags containing the crystal like substances were later found to have a combined preliminary gross weight of approximately 23.2 grams.

47.    Also, in the bedroom, investigators located differing amounts of U.S. currency in various locations. The total amount of US currency located throughout the bedroom was later counted and found to value $5,297. In a safe in the bedroom, investigators found an additional amount of U.S. currency totaling $3,608. Investigators also located a digital scale along with numerous empty plastic bags. Through past training and experience, Detective LaFave believed that these items were used for the distribution of methamphetamine. Investigators located a glass container containing a plant like material believed to be that of raw marijuana through its unique appearance and odor. Investigators located a silver case, which was found to contain a .22 caliber handgun and ammunition.

48.    In the living room, investigators located a bag of plant like material believed to be marijuana, along with a large digital scale.

49.    In the kitchen, investigators recovered two items of mail addressed to MILLER at 3959 Broadlands Avenue.

50.    Numerous photographs were taken during the search of 3959 Broadlands Avenue.

14

51.     The evidentiary items collected from 3959 Broadlands Avenue, Terre Haute, Indiana, advice of rights form and consent to search form were transported to the Terre Haute Police Department where they were sealed into evidence and secured into temporary storage per THPD policies and procedures.

52.     MILLER was transported to the Terre Haute police Department by Seelyville Officer Jason Parker. During MILLER's arrest Detective LaFave seized MILLER's iPhone.

53.     MILLER was transported to the Vigo County Jail by THPD Officer Hansford Mann. Once at the jail, MILLER was found to be in possession of an additional three (3) plastic bags each containing crystal-like substances. Officer Mann took custody of the plastic bags containing the crystal-like substance, transported them back to THPD Headquarters and turned them over to your Affiant. Field tests were completed on representative samples of the crystal-like substance which yielded presumptive positive results for the presence of methamphetamine. The three bags containing the crystal-like substances were found to have a combined preliminary gross weight of 2.4 grams. The plastic bags containing the crystal-like substances were sealed into evidence and secured into THPD temporary storage.

54.     On that same date Detective LaFave secured the iPhone into VCDTF temporary storage per policies and procedures.

55.     On July 29, 2021 the Honorable Judge Michael Lewis, Vigo County Court, Division 6 granted Detective LaFave a search warrant, cause #84D05-2107-MC-2490, for MILLER's iPhone.  Pursuant to the search warrant, MILLER's cellular phone was downloaded, extracting all available data from the device.

56.     You Affiant reviewed MILLER's cellular phone download and located a text message conversation which had been completed between MILLER, utilizing phone number (812) 229-0315, and DIXON, utilizing phone number (217) 504-4448.

57.     On April 6, 2021, DIXON sent a message to MILLER stating "I'll be there in next few days is u out of candy." MILLER replied "Yes" and DIXON stated "Ok today or Tom." Through training, experience, and this investigation, your Affiant believes that DIXON asked MILLER if she was out of methamphetamine ("I'll be there in next few days is u out of candy") and MILLER stated that she was ("Yes"). DIXON informed MILLER that he would be there the same day or the day after in order to supply MILLER with methamphetamine ("Ok today or Tom").

58.     On April 8, 2021, DIXON sent MILLER a message stating "I'm a get something yo way today is you still out of candy." MILLER replied stating "Yes" and DIXON messaged "Tom." Through training, experience and this investigation your Affiant believes that DIXON asked MILLER if she was still out of methamphetamine ("I'm a get something yo way today is you still out of candy"). MILLER confirmed that she was still out of methamphetamine ("Yes") and DIXON stated that she would be supplied with methamphetamine the following day ("Tom").

59.     On April 9, 2021 DIXON sent MILLER a message stating "Can you go pick it up rightnow." MILLER later responded "Hey you know it's only 5.42 rite." DIXON responded with a series of messages stating "It's 4 and 4," "In the box," and "Both boxes got 4 in them." MILLER responded with two picture messages of a United States Postal Labels. The first image displayed a parcel weight of 3 pounds and 12 ounces the second label displayed a parcel weight of 2 pounds and 3 ounces. MILLER then responded with a text message stating "Nope." DIXON replied by stating, "Open them they both got 4 ponds in them." MILLER responded with a series

16

of message stating, "I did only 2," a message stating, "3," a message stating, "Sry," and "Iv not touched so you can c." DIXON messaged, "Ok I'm bout to call them" and "So it's 5 and 15 oz right." MILLER responded "yes." DIXON sent a series of messages stating "Ok," "So about 6," "Thanks I'm a get it together," "So we just gone round it to 6," and "48." Through training, experience, and this investigation, your Affiant believes that DIXON instructed MILLER to go pick up methamphetamine ("Can you go pick it up rightnow"). MILLER informed DIXON that she only received 5.42 pounds of methamphetamine ("Hey you know it's only 5.42 rite"). DIXON told MILLER that it should have been eight pounds of methamphetamine, four pounds in one parcel and four pounds in a second parcel ("It's 4 and 4," "In the box" and "Both boxes got 4 in them"). MILLER sent DIXON images of the parcels which listed the weights of the parcels and informed DIXON that there was not eight pounds ("Nope"). DIXON told MILLER to open the parcels ("Open them they both got 4 ponds in them") and MILLER stated that she had already opened the parcels, saw that they only contained two and three pounds of methamphetamine, further stating that she did not touch the methamphetamine so DIXON could see for himself ("I did only 2," "3," "Sry" and "Iv not touched so you can c"). DIXON stated that he was going to call his methamphetamine source of supply and confirmed with MILLER that she had only received five pounds and fifteen ounces of methamphetamine ("Ok I'm bout to call them" and "So it's 5 and 15 oz right"), which MILLER confirmed ("Yes"). DIXON explained that he was going to round the amount up to six pounds ("Ok," "So about 6," "Thanks I'm a get it together," "So we just gone round it to 6,") and that MILLER would owe him forty-eight thousand dollars for the methamphetamine ("48").

60.     On April 12, 2021, DIXON sent two messages to MILLER stating "Hey I dropped present off in truck" and "Text back ASAP." MILLER later responded "Oh ok I'll go get it Tks."

Through training, experience and this investigation, your Affiant believes that DIXON informed MILLER that he left methamphetamine for her in her truck ("Hey I dropped present off in truck"). MILLER responded stating that she would go get it ("Oh ok I'll go get it Tks").

61.    On April 23, 2021 MILLER sent DIXON a message stating "I haven't even opened you present it's bn that slow." DIXON responded "Things will pick up no worries." Through training, experience and this investigation, your Affiant believes that MILLER was informing DIXON that her methamphetamine business was running behind, stating that she had not opened the last re-supply of methamphetamine supplied by DIXON ("I haven't even opened you present it's bn that slow") DIXON reassured MILLER that business would get back to normal ("Things will pick up no worries").

62.    On May 4, 2021, DIXON sent two messages to MILLER stating "Ok coo I will be down there in a few days slow money is better than no money" and "You think the present was to much." MILLER responded "No just seems be a lot out here rite now. Like I'm sure won't be like this for long and it will pick back up for me." Through training experience and this investigation, your Affiant believes that DIXON told MILLER that any payment to him was better than no payment, asking if he had supplied to much methamphetamine to MILLER ("Ok coo I will be down there in a few days slow money is better than no money" and "You think the present was to much"). MILLER told DIXON that the amount of methamphetamine was fine, that there was just a lot of methamphetamine in Terre Haute, Indiana, informing DIXON that business would eventually return to normal ("No just seems be a lot out here rite now. Like I'm sure won't be like this for long and it will pick back up for me").

63.    On May 14, 2021, DIXON sent MILLER a message at approximately 2:04 a.m. asking, "Can I come in the morning it's late." At approximately 4:27 p.m., DIXON sent a second

message stating, "100." Through training, experience and this investigation, your Affiant believes that DIXON was asking MILLER if he should come to Terre Haute to meet with her ("Can I come in the morning it's late"). Your Affiant believes that a meeting happened between MILLER and DIXON and DIXON sent a message after the meeting informing MILLER that her methamphetamine debt was down to one hundred thousand dollars ("100").

64.    On June 4, 2021, DIXON sent a message to MILLER stating, "Is you there now." MILLER responded stating "I'm at vet but left that for u in truck under drivers seat." DIXON responded with messages stating "Ok thanks" and "How much is it." Through training, experience and this investigation, your Affiant believes that DIXON was attempting to meet with MILLER ("Is you there now"). MILLER stated that she was not home but would leave money in her truck for DIXON to retrieve ("I'm at vet but left that for u in truck under drivers seat"). DIXON asked MILLER how much money it was ("How much is it").

65.    On June 5, 2021, DIXON sent MILLER messages stating, "It was 22 thousand," "Give me a call plz," and Call me plz." MILLER responded by stating, "Yes it was 22000" and "14 in one 8 in other." DIXON responded by stating "Ok" and "78." Through training, experience and this investigation, your Affiant believes that DIXON told MILLER that it had only been twenty-two thousand dollars, requesting that MILLER call him ("It was 22 thousand," "Give me a call plz" and Call me plz"). MILLER confirmed that it was twenty-two thousand dollars, fourteen thousand in one and eight thousand in the other ("Yes it was 22000" and "14 in one 8 in other"). DIXON informed MILLER that her methamphetamine debt was down to seventy-eight thousand dollars ("Ok" and "78").

66.    On June 7, 2021, DIXON sent MILLER a message stating "What's going on it's moving way to slow is you ok." MILLER responded stating "I know but everyone seems to have

19

it and they getting a lot cheaper is what they telling me. I still have almost everything." DIXON asked "So what number for it to be dropped to will help you out" and "what number do you need it to be dropped to to pick up the paste I don't won't you just sitting on it like that." MILLER responded "It's like 6 here." DIXON replied "That's way to cheap that's less than 400 a up." MILLER stated "It's what everyone says they getting it for and I can't beat it so iv just sit and wait sry I don't know what I can do." DIXON later asked "what if I gave it to you at 5 to spend you up," further stating "I can only really do that if the production speed up that's the only way it will make since." On June 8, 2021, MILLER stated "That would be better I could lower mine that way." DIXON asked "Ok how many." MILLER replied "Like9."  Through training, experience and this investigation, your Affiant believes that DIXON asked MILLER if she was still having issues distributing methamphetamine ("What's going on it's moving way to slow is you ok"). MILLER told DIXON that everyone was purchasing methamphetamine at cheaper prices, stating that she still had almost all of the last methamphetamine DIXON had supplied her with ("I know but everyone seems to have it and they getting a lot cheaper is what they telling me. I still have almost everything"). DIXON asked MILLER what purchase price she needed in order to speed up the distribution, stating that he did not want her to have to just hold on to all of the methamphetamine ("what number do you need it to be dropped to to pick up the paste I don't won't you just sitting on it like that.") MILLER told DIXON that pounds of methamphetamine were selling for six thousand in Terre Haute ("It's like 6 here"). DIXON stated that six-thousand per pound was way too cheap, stating that price would mean that an ounce of methamphetamine cost less than four hundred dollars ("That's way to cheap that's less than 400 a up").  MILLER stated that she did not know what else to do since she could not beat the competitors price of methamphetamine ("It's what everyone says they getting it for and I can't beat it so iv just sit and

wait sry I don't know what I can do"). DIXON stated that he would drop the price to five thousand per pound if MILLER could speed up distribution, otherwise the price would not be worth it ("what if I gave it to you at 5 to spend you up," "I can only really do that if the production speed up that's the only way it will make since"). MILLER stated that the price quoted by DIXON would work and she would be able to compete with other methamphetamine dealers prices ("That would be better I could lower mine that way"). DIXON asked MILLER how many pounds of methamphetamine she had left ("Ok how many") and MILLER stated she still had nine pounds of methamphetamine ("Like9").

67.    On June 15, 2021 DIXON sent a message to MILLER stating "If I can give you the candy at 5 how many pieces of candy do you thing you can sell in a week." MILLER replied "I have some more $ for u." Through training, experience and this investigation, your Affiant believes that DIXON was asking MILLER how many pounds of methamphetamine she could sell per week if the price was five thousand per pound ("If I can give you the candy at 5 how many pieces of candy do you thing you can sell in a week"). MILLER responded that she had more money to pay DIXON for the current methamphetamine debt she owed him ("I have some more $ for u").

68.    Your Affiant reviewed the download of DIXON's cellular phone. Your Affiant observed that the same message conversation was recovered from DIXON's phone between MILLER and DIXON. It was observed that DIXON had deleted a number of messages which were able to be retrieved out of MILLER's phone download. The conversation completed between DIXON and MILLER on April 6, April 8, April 9, April 23, May 4, May 14 and June 4, 2021 had been deleted out of DIXON's phone. The conversation on April 12, 2021 had been

21

partially deleted out of DIXON's phone. The conversations completed on June 5, June 7, and

June 15, 2021 were successfully recovered from both DIXON and MILLER's phone.

69.    Based on training, experience, and this investigation, your Affiant believes the

entirety of the conversation between Dixon and Miller indicates the methamphetamine located at

Miller's residence on June 30, 2021 was provided by DIXON. DIXON's and MILLER's

conversation April 12, 2021 indicated DIXON had dropped off methamphetamine to MILLER.

On April 23, 2021, MILLER indicated she hadn't opened the box yet.  On May 14, 2021, DIXON

indicated MILLER's debt was one hundred thousand ($100,000) dollars.  Based on training,

experience, and this investigation, your Affiant believes DIXON had dropped off at least twelve

(12) pounds of methamphetamine April 12, 2021.  The remaining conversations from May 14,

2021 through June 7, 2021 indicated that MILLER was having trouble selling the

methamphetamine and still owed DIXON seventy-eight thousand dollars.   Therefore, MILLER

was still in possession of a substantial amount of methamphetamine she had received from

DIXON.

70.    Based upon the above-described facts, information, observations, and training,

your Affiant believes probable cause exists to charge and arrest Melissa MILLER for distribution

of fifty (50) grams or more of a mixture or substance containing a detectable amount of

methamphetamine and possession with intent to distribute five hundred (500) grams or more of a

mixture or substance containing a detectable amount of methamphetamine, in violation of Title

21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.  Your

Affiant further believes probable cause exists to charge and arrest Christopher DIXON for

possession with intent to distribute fifty (50) grams or more of a mixture or substance containing

a detectable amount of methamphetamine, in violation of Title 21, United States Code, Section

22

841(a)(1) and possession with intent to distribute five hundred (500) grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

/s/ *Brian Bourbeau*
Brian Bourbeau
Task Force Officer
Drug Enforcement Administration

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

DATE: November 5, 2021



23